**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00228 (CRC)** |
| **v.** | : | |
| | : | |
| **ERIC GENE BARBER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Eric Gene Barber to a total of 120 days' incarceration, 36 months' probation, 60 hours of community service, three years of probation and $552.95 restitution.

**I.     Introduction**

The defendant, Eric Gene Barber ("Barber"), a packager in an automobile parts shop, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Barber pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building and one count of violating 22 D.C. Code § 3212: Theft II. As explained herein, a sentence of 90 days' incarceration for Count Four, 30 days consecutive for  Count Five, 60 hours of community service, three years of probation and $552.95 restitution is appropriate in this case because he: (1)  prepared for violence by wearing a

1

Kevlar ballistic helmet to Washington, D.C.; (2) heard the crowd yelling "Hang Mike Pence" and saw gallows with the wood frame; (3)  he followed the crowd and climbed through  a  broken window to enter the Capitol;  (4) he witnessed Capitol police officers being sprayed with a fire extinguisher; (5) he witnessed destruction of windows and broken glass inside the Capitol; (6) he penetrated the U.S. Capitol through the Rotunda and Statuary Hall and attempted it make it further into the Capitol where officers had barricaded or locked the door; (7)  he entered the hallway of the suite of offices assigned to Speaker of the House, Nancy Pelosi, and he was escorted out by police and then he walked around and entered the suite again; (8) he posted a video he recorded outside the Capitol via Facebook, in which he stated that Capitol Police were standing around with their hands in their pockets doing nothing while windows were being broken; (9) he stole a power station from a C-Span media station; (10) he participated in a media interview in which he lied about not entering the Capitol; and (11) he has a substantial criminal history, including a conviction for breaking and entering.

Even if he didn't personally engage in violence or property destruction during the riot, before entering the Capitol on January 6, Barber encouraged and celebrated the violence of that day.  He was captured on video saying "They're giving us the building," indicating he was fully supportive of the crowd taking control of the Capitol.

The Court must also consider that Barber's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of

numbers.") (statement of Judge Chutkan). Here, Barber's participation in a riot that actually succeeded in halting the Congressional certification combined with his preparation for violence, his participation in media interviews, his re-entry into the Speaker's office after being escorted out of that location and the potential for future violence renders a significant jail sentence both necessary and appropriate in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 29 (Statement of Offense), at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Barber's conduct and behavior on January 6.

### *Barber's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Barber traveled five hours from his home in West Virginia to Washington, D.C., to attend the "Stop the Steal" rally.  He prepared for possible violence by wearing a Kevlar ballistic helmet. After the rally, the defendant posted videos on Facebook showing his walk to the Capitol using his Facebook account "**** ******.399." On January 6, 2021, the defendant was interviewed via phone with an NBC local affiliate WTAP in West Virginia. In the interview, which references the defendant as a former Parkersburg City Council member, the defendant stated, that the Capitol had already been breached when he arrived and, "[w]hen those windows were being broken, there was officers 15 feet away with their hands in their pocket just watching." "I think at any point Capitol Police could of stopped what was happening but just didn't." The defendant did not mention that he entered the Capitol.

On January 7, 2021, the *Parkersburg News and Sentinel* ran an article titled "Parkersburg man shares experience from the U.S. Capitol."  The article summarized an interview of the defendant, "a former Parkersburg City Councilman," who provided a summary of his experience at the U.S. Capitol on January 6, 2021.  He expressed that the violence went too far. The article included three photographs from the defendant's Facebook account, one which depicted individuals scaling a wall outside the Capitol, a second showing protestors heading to what looks like a broken window at the Capitol, and the third pictured protestors standing on the grounds immediately outside the Capitol.

Figures 1, 2, and 3



The article references the defendant as providing:

"there were already people on the Capitol steps when he arrived. He said he went up the steps and saw some climbing the walls. Barber said he did not initially see Capitol Police officers cracking down on the advancing group. *"It took 'em a while before they started responding with force,"* he said. While he said he looked in a window and couldn't see much because of so many people inside, Barber said he did not enter the building."

However, U.S. Capitol surveillance video, captured Barber entering the Capitol through a broken window adjacent to the Senate Wing door at approximately 2:26:42 pm. A screenshot from the video is depicted in Figure 4 below. The initial breach of the Capitol occurred at the Senate Wing door and the window at approximately 2:13 pm. Barber was in the Capitol within 13 minutes of the initial breach and remained for approximately 34 minutes. Figure 4



On January 10, 2021, a video was posted on YouTube by Jayden X titled "Shooting and Storming Of The US Capitol In Washington DC (View Discretion Is Advised)[1]." The defendant was captured on the video inside the Capitol wearing a green army helmet, saying "They're giving us the building." The crowd is chanting "Break it down" in reference to a door in the Capitol. The video then shows the defendant attempting make it further in the Capitol building where officers have barricaded or locked the door.

___

[1] A copy of the video is provided to the Court as Attachment A. The entire video provides some context of the crowd the defendant was in the midst of during the riot. See defendant in video footage time of about 31:20-32:00.

Figures 5, 6, 7





CCTV footage from U.S. Capitol Police (USCP) captured the movement of the defendant through the Capitol.  Barber then went to Statuary Hall and the Rotunda and stole a power station from the C-SPAN media station in Statuary Hall. He searched through items at the media stand, before unplugging a power station, plugging it into a device, and taking it with him back to West Virginia.

Figures 8, 9





 A C-SPAN field service technician, DH was operating that media stand in the Statuary Hall at the time the Capitol was evacuated.   Upon return to the media stand, DH noted that only two items were taken, one was a C-SPAN foldable stool and the other was DH's personal powerstation that was used to charge an IPAD.  DH noted that the powerstation was approximately $52.95.  DH was reimbursed for the theft by his employer.  On March 3, 2021, the FBI executed a search warrant at the defendant's residence in West Virginia.  The stolen powerstation was observed being used inside the defendant's home along with the helmet worn during the riot on January 6th.

 After entering the Capitol, Barber moved through the Senate wing lobby to the Supreme court stairs to the Rotunda. Barber proceeded to move through the Statutory Hall towards the Speaker's office, as shown in Figure 10.

Figure 10



Barber had to be removed from the hallway adjacent to the Speaker's office not once but twice. The first time he exited (Figure 11) but then returned (Figure 12).

Figure 11 and 12





Figure 13 shows police escorting Barber out of the suite containing the Speaker's office for the second time.

Figure 13



Barber admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so, and that at the time he removed the power station, he did not have permission of the lawful owner to remove it.

*Social Media Posts*

*Figure 9*



On December 30, 2020, Barber updated his Facebook profile page to include a photo of him wearing a white shirt in front of the Capitol.  After the attack on the Capitol, Barber used Facebook to post a video he took on January 6 in which he spread false information that he was just reporting on the attack and was not part of the mob that entered the Capitol.  Figures 10 and 11 below are screenshots from the posted video that include his new profile page.

Figures 10, and 11

Additionally, Barber was depicted in a social media post of a tipster inside the Capitol along with a crowd of rioters.



On March 3, 2021, following his initial appearance in U.S. District Court in West Virginia, Barber provided a written statement to reporters in which he expressed remorse and asked for prayers for his family.

*Barber's FBI Interview[2]*

Barber waived his Miranda rights and voluntarily agreed to an interview with the FBI at the time of his arrest on March 3, 2021. Barber stated he was walking behind someone carrying a giant American flag.  He reached the big driveway and jumped on a truck to get a better look.  He saw people on the steps at the Capitol.  He was motivated to enter the Capitol by taking pictures and live video.  He could see it was "a little rowdy, but it didn't come across as like, like super violent, you know, people hollering and stuff." *Interview of Barber at 9:54:02,* Tr. pg.10 lines 19-21. "[T]he officer said hey, no reason to climb this wall. You can just walk around. Don't risk falling and getting an injury.  So, I walked around, and then walked up to the front of the building, where you could see out across the whole area….. no sooner did I get there, there was a huge crowd …. moving." ……There was a line a couple of people wide, ….. "they was pushing forward

---

[2] The video-taped interview is provided to the court as Attachment B and the Transcript of the interview as Attachment B-1.

And I figured it was just an open door." It was people hopping through that window." Id. *at 9:55*
Tr. pg. 10 lines 22-25; pg. 11 lines 1-10.

Barber admitted he showed a significant lack of judgment when he entered the Capitol with
the wave of bodies. The following are excerpts and descriptions from Barber's interview [with the
FBI] "…I went through the window…..there was an officer just standing right there, just staring
at me. – He wasn't doin nothing." Id. *at 9:56* Tr. pg. 11 lines 22-25, pg.12 line 1.  It was Capitol
police and groups of people "3 wide deep."  The police were not arm locked, just standing there
and the people started hollering and "like they were negotiating with them to let us through." "The
Alpha males…. hollering back, no violence….. if they are going to let us through,….we have to
be calm." At some point, the officers let them through. Id. *at 9:*57:52 Tr. pg. 12 lines 10-25. They
spilled out to the Rotunda.  People were taking photos and selfies and trying to go live. Id. *at* 9:58
Tr. pg. 13 lines 1-7. "Still up to that point, I knew, obviously I was somewhere where I wasn't
supposed to be. But I still didn't feel, all right, this is a full-on riot."   …..If I'd have showed up
earlier, and could have  seen…. what was going on, on the steps where the barriers were being
breached and people were, you know grabbing at police officers, maybe that would have been like
oh , pump the brakes, this is ugly." It wasn't till I was really in there, that I thought, oh this is bad.
Id. *at 9:58*- 9:59 Tr. pg. 13 lines 8-17.

 "I kind of just went with the crowd."  "At some point climbed a set of stairs.  I really don't
know where I'm at. 2nd floor………..I just kind of fell in with some people and was just going
along, just see where we ended up." ….. "After things were starting to get a little bit more like
"riotous, you know, like people are breaking things, people are stuff like that." …………"I kind
of had like a moment where I was, you know, like I was shouting and carrying on with the mob

too." "But never was inclined to break things. ….. I never felt like need to break something." Id. at 9:58 -10:00 Tr. pg. 14 lines 1-13.

The crowd dispersed and went other places. He walked around and observed things broken and thought this was a bad scene and he should have stayed home. Id. *at 10:01* Tr. pg. 14 lines 14-25 "….the  officer approached me,  real thin,  petite black woman who seemed very, very authoritative.  She gave me some direct commands that clearly, by her tone of voice, indicated that I needed to listen. …… They were rounding people up into the Rotunda. …….They were…. hording people into a secured area and…… I was like, you know, this is……different than I thought it was going to be.  About halfway through it is when I realized, this is, this is more serious than just some people being rowdy at a protest."  Id. *at 10:02* Tr. pg. 15 lines 6-20. During that interview, Barber said a protest is one thing but when he started seeing stuff that reminded him of the protest of the summer.  "People starting to be destructive, I mean, it's our Capitol." You are supposed to hold something sacred says the guy that went through the building -but you know um I don't know when it actually dawned on me that this is a bad deal, you shouldn't be here you know so after that right about then I just kinda wandered around the general area sightseeing. Then I went back to the Rotunda and decided you shouldn't be here.  I went outside and just left. Id. *at 10:01- 10:03* Tr. pg.15 lines 20-25, pg. 16 lines 1-6.

When asked about the theft of the power station from the C-SPAN media station, Barber claimed he was "looking for a way to charge my phone," and denied that he had stolen "all kinds of valuables" ………..that he saw in the Capitol, and "didn't do things I saw being done there" by others. Id. *at 10:06- 10:08*  Tr. pgs. 19-20.

So many people in West Virginia were pumped up to come to the rally.  "I was going to be super hard and go punch a Antifa terrorist in the face. And I end up being the terrorist. Plot

twist, huh?" (laugh) Id. at 10:14:23 Tr. pg. 28 lines 9-11……."I hope it doesn't sound like I'm shifting blame, but I think the lapse of security had just as much to do with it as anything else.  I think if the building had been protected a little better, then it wouldn't have happened."  Id. at 10:17:36 Tr. pg. 30 lines 20-24……. I remember saying I can't believe this is happening…. The rally was joyful, people smiling ……. by the time they got to the Capitol, people were "Hang Mike Pence." Id. at *10:13:45 to 10:20* Tr. pg. 31. *"I saw someone spray an officer with a fire extinguisher and witnessed people inside busted out glass – they broke windows, …… I backed out and two officers there covered in chemical white powder. I said this sucks.  I started feeling in my heart this is taking a turn.  I walked up another hallway sightseeing and officers told me I needed to get out and led me to the Rotunda.  Officers standing in the Rotunda. … I told officers I wanted to get out of the building. They parted the ways and let me through. I was at a large group of people that left and walked around the corner where the lady got shot, that could have been me….." Id. at *10:21 through 10:24*  Tr. pgs. 33-34.... *s*aw dust – thought it was gas…this is getting too much.  I took pride in being asked to speak at Back the Blue Rally …once I saw cops being mishandled my perspective changed. Id. *at 10:29 -10:30* Tr. pgs. 39-40.   Barber admitted that he wore the helmet to stand up to Antifa. He wanted combat, not against his government. "First heard about a group meeting…. saw yellow and black, proud boys – Alex Jones is going to group up a bunch of people at Freedom Plaza……… and take it to Antifa"…….. "Punch dudes in the face and go home a hero". …. "planned to go and punch Antifa." Id. at *10:30 to 10:34* Tr. pgs. 40-44.

*The Charges and Plea Agreement*

On February 16, 2021, Barber was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2) and 22 D.C. Code § 3212. On March 3, 2021, he was

15

arrested at his home in West Virginia. On March 18, 2021, Barber was charged by five-count Information with 18 U.S.C. §§ 1752(a)(1); (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G) and 22 D.C. Code § 3212. On December 16, 2021, he pleaded guilty to Counts Four and Five of the Information, charging him with violations of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building and 22 D.C. Code § 3212, Theft II. By the plea agreement, Barber agreed to pay $552.95 in restitution to the Department of the Treasury, $500 to the Architect of the Capitol, and $52.95 to C-SPAN for the stolen power station. *See* Plea Agreement, ECF 20, at ¶ 10, page 6.

### III.     Statutory Penalties

Barber now faces a sentencing on Count 4 for violating 40 U.S.C. § 5104(e)(2)(G) and Count 5 for violating 22 D.C. Code § 3212. As noted by the plea agreement and the U.S. Probation Office, Barber faces up to six months of imprisonment and a fine of up to $5,000 on Count 4. Barber faces up to 180 days of imprisonment and a fine of up to $1,000 on Count 5. Barber must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, this Court must assess Barber's individual conduct on a spectrum. This Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are

not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Barber personally engaged in violence or property destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Barber's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Barber from most other misdemeanor defendants.

Barber was prepared for violence when he traveled to Washington, D.C. He dressed for the part with his Kevlar ballistic helmet.  These facts are important as they show Barber's preparation for violence.  He admitted during his FBI interview that he intended to punch a member of Antifa in the face on January 6.

When Barber descended on the Capitol, he knew that it would be violent. Barber posted photos of the chaos and followed the mob inside.  By posting the photos to Facebook, he clearly sponsored the content. While Barber himself did not participate in that physical attack, he stood by while police officers were assaulted by being sprayed with a fire extinguisher and he added to the officers' difficulties during the riot by pushing through the crowd. Barber said at one point, "they're giving us the building."

Barber celebrated the violence and destruction as it is happening around him and rather than leaving the Capitol, he wandered around, according to him, "sightseeing."

In both of Barber's media interviews, he mentions the lack of police response and demonstrated that he wanted to share with others that the police were outnumbered and overcome by the rioters. Barber entered the building approximately thirteen minutes after it was first breached at his location of entry. While no police officers blocked his path, there were clear signs of violent entry. The window through which Barber passed and the adjacent door had just been

smashed. Barber walked directly past a pile of shattered glass on the ground as he moved deeper into the U.S. Capitol. He would have heard the alarm sounding throughout the Capitol Rotunda and its antechamber: a loud, high-pitched, continuous beeping, similar to a smoke alarm. Barber did not stop at the Rotunda, but instead moved deeper into the U.S. Capitol until he entered the Speaker's suite of offices. Police officers told him to leave. Footage indicates he spent a minute and a half inside, went back to the Rotunda, made a loop and went back into the Speaker's area and was escorted out again by an officer.

It is hard to credit Barber's statements about remorse to the FBI after his arrest and in his statement to the media[3] following his initial appearance on March 3, 2021, given the severity of the conduct, his overall statement and his demeanor in the FBI and media interviews. Judge Chutkan's words about defendant *Mazzocco* in 21-Cr-00054(TSC), Tr. 10/4/2021 at page 29, ring true here.  "Mr. Mazzocco's remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions." Importantly, Barber failed to tell the FBI that he entered the Speaker's suite in an effort to minimize his conduct.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Barber's History and Characteristics

As set forth in the PSR, Barber is a 43-year-old man with a lengthy criminal history that includes Breaking and Entering and Petit Larceny on July 20, 1999.  Barber stole property from a

---

[3] A copy of the media report containing his statement is provided to the Court as Attachment C.

school and was initially released from his sentence to parole. But he violated parole and was re-incarcerated.  PSR ¶ 31 On May 22, 2003, he was convicted of Driving while under the influence, possession of marijuana and fleeing a check point. According to the PSR he told police that he had a 1967 Camaro he would give to someone to make the charges go away. PSR ¶ 32 Barber had several altercations with law enforcement that involved public intoxication, failure to respond to a citation, driving while under the influence, disorderly conduct and operating a vehicle with a suspended license. PSR ¶ 33-36 He also has numerous traffic infractions for speeding and driving without an inspection which further indicates his lack of ability to follow the rules of society.  PSR ¶39- 46 Barber also had a domestic violence emergency protective order filed against him on November 17, 2009. PSR ¶ 50 Barber's history and propensity for breaking and entering, theft and not following rules demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[4] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[4] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight        and       Reform       Committee       (June       15,       2021),       available       at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of

an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Barber's post-arrest interview and statements on social media clearly demonstrate the need for specific deterrence for this defendant. Barber joined the mob and celebrated that "they are giving us the building." After the attack, Barber tried to play the hero to the West Virginia media, even while lying that he did not enter the Capitol. He claimed that the police were doing nothing. This is flatly untrue as Barber well knows. He simply failed to follow police instructions to leave. Barber had an agenda and was not going to be deterred.

The government acknowledges that Barber accepted responsibility early by entering into this plea agreement. On the other hand, Barber's failure to acknowledge the dangers and violence of January 6, underscores the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[5] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[6] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

---

[5] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities. Attachment D.

[6] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Barber has pleaded guilty to Counts Four and Five of the Information, charging him with parading, demonstrating, or picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G) and a violation of 22 D.C. Code § 3212. Court 4 is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch

of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court should consider the sentences imposed in the following cases: *United States v. Robert Schornak* 21-cr-278-1 (BAH) sentenced to 28 days intermittent incarceration, 14 days at a time, 2 months home detention and 36 months' probation. Barber like *Schornak* prepared for violence by wearing a helmet, witnessed assaults on officers and committed theft inside the Capitol Building – *Scornak* took an American flag which he passed off to others outside, Barber took a powerstation home and was still using it months later when the FBI searched his home; *United States v. Mitchell Vukich and Nicholas Peretta* 21-cr-539 (TSC) sentenced to 30 days incarceration, *Vukich* and *Peretta* like Barber witnessed assaults on officers and they stole from the Capitol.    *United States v. Adam Johnson,* 21-cr-648 (RBW) sentenced to 75 days incarceration, Barber like Johnson witnessed assaults on officers and entered Speaker Pelosi's suite of offices; *United States v. Derek Jancart* 21-cr- 148 (JEB) *and Erik Rau* 21-cr- 467 (JEB) *Jancart* and *Rau* both received 45 days of incarceration, they witnessed violence as they approached the Capitol and made their way to Speaker Pelosi's conference room.  Barber prepared for violence by wearing a Kevlar helmet whereas *Jancart* and *Rau* prepared for violence by bringing a gas mask and Kevlar gloves respectively.

The government has requested, and the courts have imposed, sentences of incarceration in most cases where defendants gained entry to sensitive spaces inside the Capitol Building. *See, e.g.,*

*United States v. Mazzocco,* 1:21-cr-54 (TSC) sentenced to 45 days of incarceration where defendant walked into an office area with desks, a computer and numerous paper files.; *United States v. Ericson,* 1:21-cr-506 (TNM) sentenced to 20 days of weekend incarceration where defendant entered Speaker's conference room and other office space; but see *United States v. Marquez*, 1:21-cr-136 (RBC) government requested four months of incarceration for defendant who entered Senator Merkley's office; sentenced to 18 months' probation, citing mental health issues.

Here, the Court should also consider the sentence imposed in *United States v. Virginia Marie Spencer,* 21-cr-00147-02 (CKK). *Spencer* was sentenced to 90 days incarceration. Like Barber, *Spencer* entered the Speaker of the House office space, witnessed violence against law enforcement officers, minimized her conduct to the FBI, and had a criminal record. *See also United States v. Jeffrey Alexander Smith,* 21-cr-00290 (RBW) who was sentenced to 90 days incarceration for parading and demonstrating, pushing past police and unlike Barber, *Smith* had no criminal record. In *United States v. Robert Maurice Reeder* 21-cr-166(TFH) *Reeder* was sentenced to 90 days incarceration and like Barber took photos of the chaotic mob, saw law enforcement officers being assaulted, heard and witnessed the mob chanting "Hang Mike Pence" and disregarded police orders. See also *United States v. Frank Scavo* 21-cr-254 (RCL). *Scavo* was a local politician from Pennsylvania like Barber he minimized his conduct in a local TV news interview by denying that he entered the Capitol. *Scavo* was sentenced to 60 days incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Barber to 90 days' incarceration on Count Four, 30 days consecutive on Count Five, 60 hours of community service and $552.95 in restitution and three years of probation. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.


                        Respectfully submitted,

                        Matthew M. Graves
                        UNITED STATES ATTORNEY


            By:     /s/ Brenda J. Johnson
                        Brenda J. Johnson
                        D.C. Bar 370737
                        Assistant United States Attorney
                        National Security Section
                        U.S. Attorney's Office
                        601 D Street, N.W., Room 5-122

Washington, D.C.  20530
Office: 202-252-7801
Brenda. Johnson@usdoj.gov