**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|                              |     |                          |
|------------------------------|-----|--------------------------|
|                              | )   |                          |
| **UNITED STATES OF AMERICA** | )   | Crim. No.  21-228 (CRC)  |
|                              | )   |                          |
| v.                           | )   |                          |
|                              | )   |                          |
| **ERIC BARBER**              | )   |                          |
|                              | )   |                          |
|                              | )   |                          |

**<u>MEMORANDUM IN AID OF SENTENCING</u>**

*Where all think alike, no one thinks very much.*

*Walter Lippmann*

On January 6th, Eric Barber regretted his decision to go to the U.S. Capitol. He disavowed his conduct from that day forward. "I don't think it should have been done" is what he told news and media outlets on January 6th. Out of fear of further incriminating himself, he denied being inside the building, but the reality of what he had done became very clear. "I am prepared to accept the [] consequences of my mistake and accept responsibility for my actions," he explained to the local news station later that day.



Two months later, Mr. Barber met with the FBI and explained that he regretted his decision to enter the Capitol. Since then, he has waited patiently as he was guided through the legal process to arrive at sentencing. He did not challenge the evidence in his case or take his case to trial. He also welcomed the opportunity to speak with the House Select Committee to discuss the circumstances that led to January 6th.

Mr. Barber has not wavered from his denouncement of his actions, even when it was tempting to promote his actions. As a former Council Member in a conservative part of West Virginia, his support of Former President Trump drew attention and praise. During January 6th, he was seen as "a great patriot." Despite this, Mr. Barber has continued to state that his actions were wrong.

Mr. Barber had no plan, intention, or thought to take over the government on January 6th. He was not part of a militia group seeking to overthrow the government. He did not encourage violence. He followed commands of law enforcement on January 6th and cooperated with law enforcement thereafter, and has demonstrated remorse. For these reasons, no further incarceration should be imposed. Based on the nature and circumstances of the offense, his background, acceptance of responsibility, and the relevant sentencing factors pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of time served or probation, either of which would be a sentence not greater than necessary to address his conduct in this case.

## <u>TIMELINE OF JANUARY 6th EVENTS</u>

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[1]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[2]  The vitriol and antagonistic speech spread over the crowd of thousands. Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

<u>11 a.m.</u>                   High-profile figures of the Republican Party spoke directing the Trump supporters:
- Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[3]
- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[4]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican

---

[1]      Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[2]      George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[3]      *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

[4]      *Id*. (emphasis added).

lawmakers to challenge the election result and **"punch back from Donald Trump."**[5]

- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right.**"[6]
- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[7]
- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[8]

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| | |
|---|---|
| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[9] |
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk down Pennsylvania Avenue. I love Pennsylvania |

---

[5]     *Id*. (emphasis added).

[6]     *Id*. (emphasis added).

[7]     *Id*. (emphasis added).

[8]     *Id*. (emphasis added).

[9]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

Avenue. **And we're going to the Capitol**, and we're going to try and give.[10]

By this time, his supporters started heading towards the Capitol and started fighting with the police.

| | |
|---|---|
| **1:10 p.m.** | Supporters "begin grappling with police on the Capitol steps." [11] |



| | |
|---|---|
| **1:30 p.m.** | After Trump's speech, "supporters being marching toward the U.S. Capitol."[12] |

---

[10]      *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[11]      Petras, *Timeline*, footnote 2 supra.
[12]      Shelly Tan, Youjin Shin and Danielle Rindler, *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post, https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/ (last accessed on Feb. 28, 2022).

**2:11 p.m.**                Photographs indicate that supporters moved past the
                             police lines on the west side of the Capitol and others scale
                             the walls.[13]

- **Eric Barber did not breach the perimeter or
  fight officers to get past the perimeter lines.**



**2:26 p.m.**                Eric Barber enters the Capitol through the Senate Wing
                             windows, near the doors.  At least 100, people entered
                             through the doors and windows for at least 10 minutes by
                             this time.

---

[13]       Petras, *Timeline*, footnote 2 supra.

**2:29 p.m.**                Mr. Barber is seen on CCTV footage with his helmet off
                            and looking at his phone in the Rotunda.  He continues to
                            walk towards the end of the hallway and takes pictures
                            and live streams.
                            Mr. Barber will next proceed to Statuary Hall.



**2:30 p.m.**                Adam Johnson is seen carrying Nancy Pelosi's lectern in
                            the Rotunda.



**2:31 p.m.**[14]          Prior to Mr. Barber entering Statuary Hall, another individual looks through items at the CNN camera station.



---

[14]       The Court should note that the CCTV footage for Statuary Hall and other sections of the Capitol have time stamps reflecting 1900 hours, which is 5 hours different from the Senate Wing door time stamps of 1400 hours.  It is unclear why the video footage has different time stamps. To be clear, Mr. Barber was not in the Capitol for 5 hours.  See ECF No. 36, p. 5.



**2:31 p.m.**              Mr. Barber walks through Statuary Hall and is about to exit.



Closer view



**2:31 p.m.**

Mr. Barber is seen at the CNN camera station trying to plug in his phone with different devices and returning items that are not connecting to his phone.



Closer view below



**2:31 p.m.**         Mr. Barber eventually finds a compatible charger and
                      takes it with him.

| | |
|---|---|
| **Approximately 2:37 pm**[15] | Mr. Barber and others are captured on a Jayden X video. At minute 31:17, someone closer to the doors in the video, states, "the police are leaving." |

*Minute 31:17*



*Minute 31:22*

Five seconds later, a man wearing a yellow flag around his neck, to Mr. Barber's right, repeated that "the police are leaving."



---

[15]    The video footage from the Jayden X video does not contain a time stamp.  This approximation is based on the CCTV footage showing Mr. Barber at earlier times.

**Minute 31:26**

After hearing, "the police are leaving," Mr. Barber **asked the question**, "They're giving us the Capitol?" The man to his right nods his head "yes."



**2:56 p.m.**

At some point, Mr. Barber and several others walk to the Speaker's officer and hallway.

CCTV footage shows that he and several people walk through the connecting hallways and return to the hallways, more than once, appearing to be looking for the exit. This occurred even after officers direct them to exit.

**2:58 p.m.**

Mr. Barber appears to have been lost and was directed by another officer in a separate direction.





USCH 02 H227 Hallway - 2021-01-06_19h40min01s

**2:58 p.m.**                    Mr. Barber explained to the FBI after the incident that he
did not know where he was in the building.  See Interview
of Eric Barber, Tr. at 13:19-25 – 14:1-6, March 3, 2021

```
18          BY DETECTIVE 2:

19      Q.   So where'd you go while you were inside?

20      A.   Well I don't know the building very well.  I kind

21   of just went with the crowd, and --

22      Q.   Hallways, (indiscernible), stairs?

23      A.    Yeah.  There was a hallway, and then I remember, I

24   don't know if it was the Rotunda, or it was below it, but at

25   some point I climbed a set of stairs.  I went up a, like a

                                                              14

1    (indiscernible) looking set of stairs, and I assume I'm on

2    the second floor at that point.  And like, you know, I

3    really don't know where I'm, where I'm at, because I don't

4    know the building.  And, you know, I just kind of fell in

5    with some people, and was just going along, just see where

6    we ended up.
```

## LEGAL PRINCIPLES

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of

40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense," as defined by

18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six

months or less.  Similarly, Theft II, in violation of 22 D.C. Code § 3212, is a

misdemeanor, which carries a maximum period of 180 days.

The United States Sentencing Guidelines do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. In addition, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment. 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow. *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Since the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant." Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id.* at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* at 2 (B-D). Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id.* at (3), (6), & (7).

## ARGUMENT

Mr. Barber is a 43-year-old father and former City Council member.  While the nature and circumstances of the January 6th events were indeed serious, his particular actions that day, paired with his individual history and characteristics do not lend itself to a sentence of incarceration.  Rather, a sentence of probation and restitution would meet the purposes of sentencing, without being overly punitive.

## I.   <u>Nature and Circumstances of Mr. Barber's Offense</u>

The events of January 6th are seared into the nation's memory.  That day and the days after resulted in lost lives and over 1 million dollars in property damage. In addition, it caused trauma to politicians and staffers and their family members who were present there and who watched from a far.

Mr. Barber understands and would never minimize the impact of the event on the nation.  However, he was not the cause of January 6th, nor was he in the category of people who caused physical harm to others or damage to the Capitol buildings.  He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day. Various factors led to the Capitol being breached, including "paralysis" "exacerbated by the patchwork nature of security across a city where responsibilities are split between local and federal authorities" and "driven by unique breakdowns inside each law enforcement agency."[16]  To characterize Mr. Barber as the proximate cause

---

[16]     *See* Jacqueline Alemany, et. al., *Before, During, and After Bloodshed*, The Washington Post (Oct. 31, 2021), available at
https://www.washingtonpost.com/politics/interactive/2021/what-happened-trump-jan-6-insurrection/?itid=hp-top-table-main.

of the January 6th event fails to acknowledge these other failures, and places an unjust blame on one non-violent, non-destructive individual. The American system of justice, and specifically 18 U.S.C. § 3553(a), directs this Honorable Court to look at every defendant and every defendant's actions individually. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

Mr. Barber traveled alone to the Capitol. He attended the rally alone and found commonality with several others in attendance. He regretfully went along with the crowd. He was arrested on March 3, 2021 and spoke with the FBI without counsel. He explained to the FBI agents after the incident and to the House Select Committee that the tenor of the crowd was initially nonviolent from the perspective he had. An officer told him there was "no reason to climb the wall" and instead "to just walk around." Interview of Eric Barber, Tr. at 10: 22-25. Regarding the crowd, he explained:

> And people started hollering and, you know, saying -- like they were negotiating with them [officers], you know, let us through. And I could -- I couldn't hear what the officers were saying, but every once in a while, someone like a point, like the alpha male look there, that were all geared out, **they were hollering back, no violence. You know, if they're going to let us through, we have to, we have to be calm**, stuff like that.
> And it seemed like everybody kind of settled down. And then at some point the officers moved out of the way, and they let the crowd go forward again. And then I think that's when it spilled out into the Rotunda. And alls I could see was people just like taking photos. And like everybody was taking selfies and, you know, trying go live and stuff like that. And still up to that point, I knew, obviously I was somewhere where I wasn't supposed to be. **But I still didn't feel, all right, this is a full-on riot. You know, if I'd have been there earlier, if I'd have showed up earlier, and could have seen, you know, what was going on, on the steps where the barriers were**

**being breached and people were, you know, grabbing at police officers, maybe that would have been like oh, pump the brakes, this is ugly. It wasn't, it wasn't till I was really in there that I thought**, oh this is bad.

Tr. at 12:18-25 – 13:1-17.

Mr. Barber does not justify his conduct.  He recognized that he was "where [he] wasn't supposed to be."  Tr. at 13:8-9.  He explained to the FBI agents his observations of the crowd.  He was not in the front of the crowd, where there were interactions with the police and the breach occurred.  Throughout the interview with the agents, Mr. Barber expressed regret and accepted responsibility for his actions:

- I had a **pretty significant lapse of judgment**, then went ahead and, you know, went with the wave of bodies.[17]

- Yeah, just, you know, kind of meandered around until, until I felt like this is, this is a bad scene. When I started seeing people like -- you know, thing -- when I started observing things broken, you know -- yeah, so it was just a bad deal. … **Obviously I wish I would have stayed home that day.**[18]

- And about, about halfway through it is when I realized, this is, this is more serious than just some people being rowdy, at a protest. You know, a protest is one thing, but when **I started seeing stuff that reminded me of the riots from the summer, people starting to be destructive, I mean, it's our Capitol**. You know, you're supposed to hold something sacred, says the guy who went through and did (indiscernible) the building.[19]

- And when I went outside, I went straight – just left, straight. Didn't stop, didn't chitchat with nobody. I didn't stop to take no more photos. **Just said no, I shouldn't be here, and left**.[20]

- I mean, being there was bad enough. I'm not saying I took pride, … I was thankful after the fact that I didn't do the things that I saw being done there,

---

[17]     Tr. at 11:11-13 (emphasis added).
[18]     Tr. at 14:21-25 – 15:2-3 (emphasis added).
[19]     Tr. at 15:18-25 (emphasis added).
[20]     Tr. at 16: 7-10 (emphasis added).

and … that I had a little bit better in me than -- **obviously I wasn't supposed to be there.**[21]

- Q. No, and I appreciate the -- you've been completely honest with you -- with us, at every turn, and cooperative. That always plays to your favor. A. I understand. There's nothing I could do now. **I can't lie about it. I can't deny it. I just have to own it**, and accept the -——

- A. Right. And I even -- I mean, even after -- I'd say **I did those media interviews with television and newspaper, probably a couple of hours after I left D.C., and I told them, you know, that what -- it wasn't, that wasn't good. Like we should be a little bit ashamed about what we did.** And I'm not sure that that got printed.[22]

- so many people in West Virginia that were friends of mine were all pumped up and like, we're going. It's going to be awesome, da, da, da, da, da. And everybody was taking the bus, which -- but I, you know, was thinking I was going to be super hard and go punch a Antifa terrorist in the face. **And I ended up being the terrorist**. Plot twist, huh?[23]

- Q. At least **you still keep your sense of humor about it**.  A. That's the only thing, **because I'm so upset, I'm so, so like worried about how this day is going to turn out, and what's going to happen in the future. It's a coping mechanism. I'm not trying to take this lightly.** I'm just trying to keep from, like -- DETECTIVE 1: Understood. MR. BARBER: -- collapsing into -—[24]

- **I was like oh, we're not heroes.** We're not, we're not patriot protesters. We're no better than the, the rioters from Antifa. So, you know.[25]

- And, you know, once you got there, I mean I probably could have stepped off to the side, or pumped the brakes, but the group that -- there was people pushing you from behind. Like there was a lot of -- Q. Momentum? A. Yeah. It's just weird. **I'm not going to say, oh the crowd pushed me in the building, wasn't my fault. No, no. I reached up there and pulled myself in.**[26]

---

[21]     Tr. at 21:18-25 (emphasis added).
[22]     Tr. at 23:14-19 (emphasis added).
[23]     Tr. at 28:6-28 (emphasis added).
[24]     Tr. at 28:12-20 (emphasis added).
[25]     Tr. at 30:5-7 (emphasis added).
[26]     Tr. at 33:11-19 (emphasis added).

- I mean, at some point **I should invoke my constitutional privileges of, you know, right to non[-]incrimination. But I'm trying to be as honest and cooperative, just because it's, this is the way it should be.** You know, and my lawyers are subject to be mad.[27]

- You know, and part of me never been in the military, but coming from a strong military family, you know, I wanted a little bit of combat, you know -- **certainly not against my government**.[28]

- And, I mean, that's literally the smart way to go. But **I'm trying to, to hold myself accountable, to be honest, to be forthcoming in saying, you know, I did something wrong, I'm ready to take responsibility,** here's my side of the story. I mean, for all I know, I've said two or three things that could get me in more trouble. I don't know.[29]

Regardless of what led Mr. Barber to the Capitol, it is clear that he did not engage in destructive or assaultive behavior inside the Capitol.  Nonetheless, Mr. Barber has admitted guilt and is remorseful for his conduct.

## II.   <u>Mr. Barber's History and Characteristics</u>

Eric Barber had an unstable childhood.  His parents divorced during his teen years and custody shifted between his mother and father.  When his father remarried, he lived with his stepmother who he described as "abusive and mean." She imposed corporal punishment and "beat him pretty bad" and the "more aggressive abuse" came around 5th or 6th grade when he was 11 years old.

At some point, he resided with his grandmother, when his parents no longer wanted to raise him.  When his grandmother could no longer care for him, he ended up in the foster care system.  His foster parents provided "no structure or

---

[27]    Tr. at 40:14-18 (emphasis added).
[28]    Tr. at 41:22-25 (emphasis added).
[29]    Tr. at 49:20-25 (emphasis added).

discipline."  Instead, they provided alcohol to him and other underage teens in the neighborhood.

At 19 years old, he was expelled from school.  He had been placed in the behavior disorder program.  At the age of 20, he was convicted of a felony and spent approximately 5 years in prison.  He obtained his GED in the penitentiary and completed a semester of college.

From 2017 to 2020, Mr. Barber served as a city council member in Parkersburg, West Virginia.  Prior to that, he was working as a construction worker and was a new homeowner in what he described as a "very bad neighborhood."  He contacted his city council member about the neighborhood and improvements that were needed.  His council member suggested that he should run for election to the city council. During the House Select Committee interview, Mr. Barber explained that he had been a life-long independent.  The Democrats had not put anyone in the primary and he came from a poor neighborhood and had a labor background that endeared him to the voters in his area.  In the end, he won the election by 6 votes.

His term ended in 2020.  He described how during former President Trump's term, national politics became local politics.  The more Mr. Barber tweeted opinions similar to Trumps, the more attention he received from conservative constituents. He regrets mimicking himself after Trump.  He removed himself from social media.

During his city council term, he was employed as an HVAC technician and lost his job as a result of January 6th.  He was unemployed for six months until June 2021.

Mr. Barber is a father of two young daughters.  He struggled with obtaining employment to provide for his family after he was fired.  He regrets the impact his actions have had on his family – "You know, I just got my life where I wanted it. You know, my daughter's in school, got a nice home, a hobby.  You know, now I ruined it, potentially by, you know, doing something really stupid."  Tr. at 48:2-5.

### III.   A Probationary Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Barber, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual.  Since the beginning of the COVID-19 pandemic, the virus spread rampantly in detention facilities.  Thousands of BOP inmates have

tested positive for COVID-19 and the latest BOP numbers show that 271 inmates

have died from COVID-19.[30]   With the rise of COVID-19 variants, the risks of

contracting the virus and death remain a serious concern for inmates.

IV.   **A Probationary Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Barber.**

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider

"the need for the sentence imposed—. . . to afford adequate deterrence to criminal

conduct...[and] to protect the public from further crimes of the defendant."  The

public has been protected while Mr. Barber has been on pretrial release.  The public

will be protected while Mr. Barber is being supervised by the Probation Officer,

which will further deter any criminal conduct.

While "[p]rison is an important option for incapacitating and punishing those

who commit crimes," evidence suggests that lengthy prison sentences do not have a

"chastening" effect and "produce at best a very modest deterrent effect."  *Five*

*Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).

With respect to specific deterrence, research shows conclusively that "[t]he *certainty*

of being caught is a vastly more powerful deterrent than the punishment," that

"[s]ending an individual convicted of a crime to prison isn't a very effective way to

deter crime," and that "[i]ncreasing the severity of punishment does little to deter

crime."  *Id.* (emphasis in original); *see also* James Austin *et al.*, *How Many*

---

[30] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed December 8, 2021).

*Americans Are Unnecessarily Incarcerated?*, Brennan Ctr. For Just., N.Y. Univ. School of Law, 22 (2016) (quoting a 2011 study by criminologists concluding that "across all offenders, prisons do not have a specific deterrent effect.  Custodial sentences [jail and prison] do not reduce recidivism more than noncustodial sanctions.").  No incarceration is needed to deter criminal conduct in this case.

> ### V.  <u>Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity</u>

Sentencing Mr. Barber to probation would not contribute to an unwarranted sentencing disparity.  Approximately 171 defendants have been sentenced in these cases.[31]  Approximately 93% of the cases have been resolved as misdemeanor offenses. Of the misdemeanors cases, approximately 62.5% have been sentenced to probation or home detention as a condition of probation.  January 6th defendants in other cases who pled to the *exact* same federal charge received probationary sentences.  *See United States v. Anna Morgan-Lloyd*, Crim. No. 21-cr-00164 (sentenced to 36 months' probation); *United States v. Valerie Ehrke*, Crim. No. 21-cr-00097 (36 months' probation); *United States v. Danielle Doyle*, Crim. No. 21-cr-00324 (2 months' probation); *United States v. Eliel Rosa*, Crim. No. 21-cr-00068 (12 months' probation); *United States v. Vinson, et al.*, Crim. No. 21-cr-0355 (5 years' probation); *United States v. Andrew Wrigley*, Crim. No. 21-cr-42 (18 months' probation).

The government cites several cases to justify its requested sentence, including the case of *United States v. Adam Johnson*, 21-cr-648 (RBW).  See ECF

---

[31]     This estimate is based on the government's chart, filed at ECF No. 36-1.

No. 36, p. 25.  Adam Johnson's case and this case are very different.  As noted in the time line above, Adam Johnson not only took Nancy Pelosi's lectern, he proudly displayed the lectern and posed for pictures with it.  By contrast, Mr. Barber did not take memorabilia or take anything from members of Congress.  Instead, he took a charger because he was looking for a battery charger for his cell phone.  He did not boldly display that he stole a charger.

The government also cites to *United States v. Marie Spencer*, 21-cr-00147-02 (CKK).  See ECF No. 36, p. 25.  Spencer "minimized her conduct to the FBI."  *Id.*  To quote the government in that case, Spencer "stated she and her family could not turn around because the crowd was pushing them into the building, but this is refuted by their voluntary stroll to the Senate Wing Door."  21-cr-00147-02 (CKK), Gov't Sent. Memo, ECF No. 55, p. 13.  Here, Mr. Barber did not minimize his conduct to the FBI.  He did not blame his conduct on anyone else but himself – "**I'm not going to say, oh the crowd pushed me in the building, wasn't my fault. No, no. I reached up there and pulled myself in**." [32]

As laid out in great detail above, he was not proud of his conduct and has consistently disavowed his conduct on: (1) January 6th when he spoke to local media, (2) almost two months later on March 3, 2021 when he spoke to the FBI without counsel; and (3) on March 16, 2022, when he spoke with the House Select Committee.  His actions since January 6th have shown that he has accepted responsibility and was and remains very remorseful.

---

[32]     Tr. at 33:11-19 (emphasis added).

## **<u>Conclusion</u>**

Considering the § 3553(a) sentencing factors, a probationary sentence with a condition of home detention, and restitution in the amount of $500, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500